"the locking part of the block for throwing the block," and was again rejected, in the following language:

"Claim 1 covers no more, broadly, than the mere use of the idea of the independent locks of 435,152 on the switches of 427,328. Such use, broadly, is not patentable. The applicant is limited to his specific construction."

Patent No. 435,152 is the Norton patent, already discussed. The claim was again amended; the attorney for the expert arguing as to said claim as follows:

"It cannot be said to cover merely the use of the Norton lock on a Johnson switch. This claim is limited to a specific construction, and the structure claimed is not found in the references cited against the former first claim."

The claim was again rejected, and claim 1 of the patent in suit substituted therefor; the attorney for the applicant saying, inter alia:

"The reference cited does not have a screw thread bearing a two-part block, one part having conducting poles, and the other part engaging with a lock on the base, which is now an element of the first claim."

Claims 2 and 3, which are limited in terms to a screw-threaded spindle and threaded nut, were allowed as filed, and the objection to the first claim was amended so as to cover a certain specific construction. In these circumstances, complainant's claim should be limited to the precise construction stated by the patentee, and should not be extended to cover the broad construction abandoned by him in the patent office. And inasmuch as the defendants do not use "a screw thread bearing a two-part block," and operating horizontally, but a rack and pinion moving at right angles to the axis of the spindle, they do not infringe said first, second, and third claims. The fourth claim is a narrow claim in terms. It was narrowed by the action of the applicant in the patent office to a "block of insulating material, bearing loose poles of conducting material." It abundantly appears from the record that this claim means "poles free to move a little longitudinally in the block," as stated in the specification. The defendants' conducting poles are rigidly screwed to the block of insulating material, and therefore said block holds rigid and fixed poles, not loose poles, of conducting material. Let the bill be dismissed.

## THE RITA.

(District Court, D. South Carolina. June 2, 1898.)

1. PRIZE—CONDEMNATION—ENEMY'S VESSEL.
   A Spanish merchant vessel captured, after the declaration of war, by a United States cruiser while bound from a neutral to a Spanish port, is lawful prize, not being within the exceptions mentioned in the president's proclamation of April 26, 1898.

2. SAME—DECLARATION OF WAR.
   The act of April 25, 1898, declaring that war has existed since April 21, 1898, between the United States and the kingdom of Spain, fixes the precise period when the peculiar duties and obligations imposed by the condition of war arise.

This was a prize proceeding instituted to procure the condemnation of the Spanish steamship Rita, which was captured by the auxiliary cruiser Yale on May 8, 1898.

BRAWLEY, District Judge. The Spanish steamship Rita was captured off the island of Culebra, May 8, 1898, by the United States cruiser Yale, and sent into this port in charge of a prize master for adjudication. A libel for condemnation was filed May 17th, and a monition issued returnable June 1, 1898, on which day proclamation was duly made, and no claimant has appeared. It appears from the testimony taken by the prize commissioners in preparatorio, and from the examination of the ship's papers, that the Rita belongs to a corporation of Bilboa, Spain,—the Linea de Vapores Serra; that she is a steamship of 1,396 net tonnage; that she carried a crew of 31 persons, all subjects of the king of Spain, and a miscellaneous cargo; that she sailed from Liverpool, England, on April 9th, touched at Santander, Spain, on April 14th, and at Corunna, Spain, on April 16th, at which last-named ports she took on six passengers and a part of her cargo, consisting of wine, macaroni, and potatoes, and that she was bound for St. Juan and other ports on the island of Puerto Rico; and that the voyage was to terminate at the port of Humacao, on that island. The cargo is now being unladen under the direction of the prize commissioners, and, pending an inventory and report thereon, all questions respecting the same are reserved. The libel filed by the attorney for the United States for this district claims that the vessel and cargo are lawful prize of war, and subject to be condemned and forfeited to the United States as such, and the proofs in respect to the vessel are sufficient to enable the court to proceed to adjudication. The congress of the United States, by an act approved April 25, 1898, has declared that war has existed since April 21, 1898, between the United States and the kingdom of Spain.

The testimony shows that the Rita is a Spanish merchant vessel, owned by a corporation in the kingdom of Spain; that while on a voyage to a port belonging to that kingdom, on May 8, 1898, in latitude 18.25 north, and longitude 65.18 west, she was captured by the United States cruiser Yale. The case does not come within the exceptions declared in the fourth and fifth paragraphs of the proclamation of the president dated April 26, 1898, which exempt from capture merchant vessels loading or bound for any port of the United States within limitations as to time therein mentioned. This act of congress fixes the precise period when the peculiar duties and obligations imposed by the condition of war arise; and as this vessel was enemy property, captured after the commencement of hostilities, it is by the law of nations subject to condemnation and forfeiture. Under the influence of the milder sentiments of recent years, the private property of noncombatants upon land is generally held not liable to seizure as booty by an invading army; and it is to the credit of the government of the United States that it has sought, on several occasions, to have

embodied into the law of nations the more mild and mitigated practice of exempting merchant vessels from capture; but except in isolated cases, provided for by treaty, this policy has not met with general acceptance. While these considerations are proper for that department of the government which can make or modify the law as policy or humanity may dictate, they have no place in that department which must administer the law as it is found. It is adjudged and decreed that the steamship Rita, together with her tackle, apparel, and furniture, be condemned, forfeited, and sold as lawful prize of war; and an order will be entered providing for the distribution of the proceeds as prize money as may hereafter be adjudged.

---

## THE BUENA VENTURA et al.

### (District Court, S. D. Florida. May 27, 1898.)

1. PRIZE—RIGHT OF CAPTURE.

   By the prize law, as accepted at the present time, the war vessels of a belligerent have the right, in the absence of any declaration of exemption by the political power, to capture wherever and whenever found afloat, anything which belongs to or is the property of the enemy. Whenever it is claimed that an exemption is made by proclamation or ordinance, the burden of proof is on the claimant to show that the particular case comes within the exemption; and, although such proclamation or ordinance is to be liberally construed in behalf of the claimants, there must be found therein sufficient language to justify the court in finding that the intention was to exempt from seizure the class of property under investigation.

2. SAME—WAR WITH SPAIN—PRESIDENT'S PROCLAMATION—SPANISH VESSELS IN AMERICAN PORTS.

   The declaration in the president's proclamation of April 26, 1898, that, "Spanish merchant vessels in any ports or places within the United States, shall be allowed until May 21, 1898," for loading cargoes and departing, and shall not be subject to seizure on the voyage, applied not only to vessels in such ports at the date of the proclamation, but also to those in American ports at the breaking out of the war on April 21, 1898, and which sailed prior to the proclamation. The cargoes of such vessels are entitled to the same exemption as the vessels themselves.

3. SAME—VESSELS BOUND FOR AMERICAN PORTS.

   The fifth article of the president's proclamation of April 26, 1898, declaring that any Spanish merchant vessel which, prior to April 21, 1898, sailed from any foreign port bound to any port of the United States, shall be permitted to enter such port and discharge her cargo, and afterwards depart without molestation, does not exempt from seizure vessels sailing from European ports for Spanish ports in Cuba, to there discharge their cargoes, and which, in the ordinary course, would then come to a port of the United States to receive cargo.

4. SAME—ENEMY'S PROPERTY—NEUTRALS HAVING TRADING HOUSES IN ENEMY'S COUNTRY—CORPORATIONS.

   Vessels or property belonging to a trading house established in an enemy's country is liable to condemnation as prize whatever the domicile of the partners; and this principle applies with even greater force to the property of a corporation formed under the laws of the enemy's country, regardless of the domicile of the individual stockholders, or of any equitable interest neutrals may have therein.

5. SAME—VESSELS SEIZED BEFORE FORMAL DECLARATION OF WAR.

   The practice of a formal proclamation before recognizing an existing war and capturing enemy's property has fallen into disuse in modern times, and actual hostilities may determine the date of the commencement of